UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : CR. No. 11-063ML |
| ANJAN DUTTA-GUPTA | : |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1) of the Federal Rules of Criminal Procedure, the United States and Defendant, Anjan Dutta-Gupta, have reached the following agreement:

1. Defendant's Obligations.

    a. Defendant will waive presentation of this matter to a grand jury and consent to the filing of a one-count Information which charges defendant with Bribery, in violation of 18 U.S.C. § 201(b)(1). Defendant agrees that Defendant will plead guilty to said Information. Defendant further agrees that the time between the filing of this plea agreement and the scheduled date for the change of plea is excludable under the Speedy Trial Act, 18 U.S.C. § 3161.

    b. Defendant further agrees, upon execution of this agreement, to cooperate with the United States as follows:

        (i) Defendant will meet with government representatives as often as necessary and provide complete and truthful information to them.

        (ii) Defendant will appear and testify completely and truthfully in any and all legal proceedings, including, but not limited to, grand jury, pre-trial, trial, re-trial, and sentencing proceedings.

(iii) Defendant understands that any and all statements, information, and testimony Defendant provides must at all times be complete and truthful. If, at any time, Defendant willfully provides any false statement, information, or testimony, Defendant shall be subject to prosecution for doing so, including but not limited to prosecution for making a false statement, obstruction of justice, and perjury.

c. Defendant agrees that prior to the entry of his plea of guilty to the Information, Defendant will meet with government representatives and identify all assets over which Defendant exercises or exercised control, directly or indirectly, within the past ten (10) years, or in which Defendant has or had during that time any financial interest. Defendant further agrees to undergo any polygraph examination the United States may choose to administer concerning such assets. Defendant understands that if he provides any untruthful or incomplete statements or information regarding his assets, the United States shall be relieved of all of its obligations under the plea agreement. Defendant further agrees to forfeit to the United States all of Defendant's interests in any asset of a value of more than $1000 that, within the last ten (10) years, Defendant owned, or in which Defendant maintained an interest, the ownership of which Defendant fails to disclose to the United States in accordance with this agreement. In addition, Defendant agrees to forfeit any assets presently owned by the Defendant which are proceeds of the offense of conviction, including the repatriation of any such assets which may be located outside the United States.

d. Defendant and the United States stipulate and agree that the facts contained in the attached Statement of Facts are true and correct.

2. Government's Obligations. In exchange for Defendant's plea of guilty:

a. The government will recommend that the Court impose a term of imprisonment at the lowest point of sentences for the offense level determined by the Court under the United

States Sentencing Guidelines (the U.S.S.G. or "guidelines"), but not including probation or a "split-sentence," even if permitted under the guidelines.

b. For purposes of determining the offense level, the government agrees to recommend a two-level reduction in the offense level for acceptance of responsibility under § 3E1.1(a) of the guidelines if Defendant continues to demonstrate acceptance of responsibility through sentencing.

c. As of the date of this agreement, Defendant has timely notified authorities of an intention to enter a plea of guilty. If the offense level is 16 or greater and Defendant enters a plea of guilty pursuant to this agreement, the government will move the sentencing Court for an additional decrease of one level, pursuant to U.S.S.G. § 3E1.1(b)(2), unless Defendant indicates an intention not to enter a plea of guilty, thereby requiring the government to prepare for trial.

d. The government is free to recommend any combination of supervised release, fines, and restitution which it deems appropriate.

e. If the government, in its sole discretion, determines that Defendant has provided substantial assistance to the government in the investigation or prosecution of another person, the government will file a motion under § 5K1.1 of the guidelines asking the Court to impose a sentence below the guideline sentencing range. Defendant understands that the decision whether to file such a motion is solely up to the United States Attorney's Office and the decision whether, and to what extent, to grant it is solely up to the Court. The government has not made any promise or representation about what sentence it will recommend if it files such a motion or what sentence the Court will impose.

f. The government agrees that, except as provided for in this Agreement, no further criminal charges will be brought against Defendant for conduct described in the attached

Statement of Facts or otherwise related to the offense conduct described in the one-count Information to be filed by the government.

3. Defendant understands that the guidelines are not binding on the Court, and that, although the Court must consult the guidelines in fashioning any sentence in this case, the guidelines are only advisory, and the Court may impose any reasonable sentence in this matter up to the statutory maximum penalties after taking into account the factors enumerated in 18 U.S.C. § 3553(a).

4. The United States and defendant stipulate and agree to the following facts under the guidelines:

a. The value of the payment and the loss to the government from the offense under Guideline sections 2C1.1(b)(2) and 2B1.1(b)(1)(k) was between $7 million and $20 million.

5. Except as expressly provided in the preceding paragraph, there is no agreement as to which Offense Level and Criminal History Category applies in this case. Both the United States and Defendant reserve their rights to argue and present evidence on all matters affecting the guidelines calculation.

6. The maximum statutory penalties for the offense to which defendant is pleading are 15 years imprisonment, a fine of $250,000 or three times the monetary equivalent of the thing of value, whichever is greater; a term of supervised release of 3 years; and a mandatory special assessment of $100.

7. Defendant agrees that, after Defendant and Defendant's counsel sign this agreement, counsel will return it to the United States Attorney's Office along with a money order or certified check, payable to the Clerk, United States District Court, in payment of the special assessments. Failure to do so, unless the Court has made a previous finding of indigence, will

4

relieve the government of its obligation to recommend a reduction in the offense level under the guidelines for acceptance of responsibility.

8. Defendant is advised and understands that:

a. The government has the right, in a prosecution for perjury or making a false statement, to use against Defendant any statement that Defendant gives under oath;

b. Defendant has the right to plead not guilty, or having already so pleaded, to persist in that plea;

c. Defendant has the right to a jury trial;

d. Defendant has the right to be represented by counsel – and if necessary have the Court appoint counsel – at trial and every other stage of the proceeding;

e. Defendant has the right at trial to confront and cross-examine adverse witnesses, to be protected from self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

f. Defendant waives these trial rights if the Court accepts a plea of guilty.

9. The government reserves its full right of allocution, including the right to present any information to the Court for its consideration in fashioning an appropriate sentence, the right to correct misstatements, misrepresentations, or omissions by Defendant, and to answer any questions asked by the Court.

10. Except for paragraph 2 and 4 above, the parties have made no agreement concerning the application of the guidelines in this case.

11. Defendant understands that the Court alone makes all sentencing decisions, including the application of the guidelines and the sentence to be imposed. The Court is not bound by the parties' stipulations of fact, offense level adjustments, or the government's

recommendations. The Court is free to impose any sentence it deems appropriate up to and including the statutory maximum. Defendant also understands that even if the Court's guideline determinations and sentence are different than Defendant expects, Defendant will not be allowed to withdraw Defendant's plea of guilty.

12. Defendant hereby waives Defendant's right to appeal the conviction and sentence imposed by the Court, if the sentence imposed by the Court is within or below the sentencing guideline range determined by the Court. This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b), and the government retains its right to appeal any of the Court's sentencing determinations.

13. This agreement is binding on the government only if Defendant pleads guilty, fulfills all Defendant's obligations under the agreement, does not engage in any conduct constituting obstruction of justice under § 3C1.1 of the guidelines, and does not commit any new offenses. Defendant understands that if Defendant violates this agreement in any way, the government shall be released from its obligations under the agreement and will be free to make any recommendations that it deems appropriate. If that occurs, Defendant shall not have the right to withdraw Defendant's guilty plea.

14. This agreement is limited to the District of Rhode Island and does not bind any other federal, state, or local prosecutive authorities.

15. This agreement constitutes the entire agreement between the parties. No other promises or inducements have been made concerning the plea in this case. Defendant acknowledges that no person has, directly or indirectly, threatened or coerced Defendant to enter this agreement. Any additions, deletions, or modifications to this agreement must be made in writing and signed by all the parties in order to be effective.

16. Counsel for Defendant states that Counsel has read this agreement, been given a copy of it for Counsel's file, explained it to Defendant, and states that to the best of Counsel's knowledge and belief, Defendant understands the agreement.

17. Defendant states that Defendant has read the agreement or has had it read to Defendant, has discussed it with Defendant's Counsel, understands it, and agrees to its provisions.

_____  4/13/2011
ANJAN DUTTA-GUPTA                Date
Defendant

_____  4-15-2011
JOHN E. MACDONALD, ESQ.          Date
Counsel for Defendant

_____  4/14/2011
DAVID M. FRAGALE, ESQ.           Date
Counsel for Defendant

_____  4/18/11
ANDREW J. REICH                  Date
Assistant U.S. Attorney

_____  4-18-11
LEE H. VILKER                    Date
Assistant U.S. Attorney

_____  4/18/2011
STEPHEN G. DAMBRUCH              Date
Assistant U.S. Attorney
Chief, Criminal Division

7

## STATEMENT OF FACTS AGREED UPON BY THE PARTIES

1. From in or about 1992 through at least February 2011, defendant ANJAN DUTTA-GUPTA ("DUTTA-GUPTA") was the owner and President of Georgia corporation Advanced Solutions for Tomorrow ("ASFT"). During this period of time, ASFT was a technology services company that provided systems engineering, product assurance, program support and integrated logistics services to the United States Navy's Naval Sea Systems Command ("NAVSEA"). ASFT was headquartered in Roswell, Georgia, and the majority of ASFT's employees were located at ASFT's Rhode Island office in Middletown, Rhode Island.

2. From in or about 1996 through January 2011, ASFT secured millions of dollars in contracts from the Navy to perform various technology services for the Navy. Most of the contracts secured by ASFT were Indefinite Delivery/Indefinite Quantity ("IDIQ") contracts. IDIQ contracts give government officials the flexibility to add funding to contracts when there is a legitimate need to obtain additional services from a contractor or sub-contractor. Therefore, during the life of a contract, when specific tasks to be performed by the contractor are identified by technical experts within the NAVY, government officials are able to add funding to IDIQ contracts for additional work without the need to have that work competitively bid.

3. While the owner and President of ASFT, DUTTA-GUPTA and other members of ASFT did directly and indirectly corruptly give and promise a thing of value to a public official, namely a Program Officer, Senior Systems Engineer for the Naval Undersea Warfare Center ("NUWC"), to influence an official act and aid in the commission of a fraud on the United States. More specifically, DUTTA-GUPTA and

−1−

others agreed to pass funds on NUWC contracts to individuals or entities under the control of the Program Officer in exchange for the Program Officer's agreement to add funding for ASFT's work under its contracts with NUWC and to add additional funding that DUTTA-GUPTA used for non-Navy projects.

4. Certain examples of the conduct related to the bribery scheme are described below.

5. In or about 1996, ASFT acquired a company called AM Tech, which had an existing contract to provide technical services to the Navy. Shortly after ASFT inherited this contract from AM Tech, in 1996, DUTTA-GUPTA was contacted by Navy employee Ralph Mariano ("Mariano"). Mariano demanded that DUTTA-GUPTA pay him $6,000 per week if ASFT were to continue to receive funding from NAVSEA. Mariano was and remained a civilian employee of the United States Navy with the position of Program Officer, Senior Systems Engineer for the Naval Undersea Warfare Center. As a Program Officer, Mariano was responsible for requesting contracting officers to issue task orders through modifications on existing contracts. Mariano was also responsible for evaluating proposals during the solicitation and bidding process for new contracts. In his position as Program Officer, Mariano thereby maintained authority to add funding to existing technology services contracts, including those held by ASFT.

6. After Mariano in 1996 demanded that ASFT pay him $6,000 per week, DUTTA-GUPTA agreed to allow Mariano to increase the hourly rate that the Navy paid an ASFT employee, who, in turn, used the increase in his salary to make payments to Mariano. This method of making payments to Mariano commenced in approximately 1996.

7. From 1996 through 2010, Mariano continued to demand an increasing amount of funds from DUTTA-GUPTA and ASFT. He did so by repeatedly informing DUTTA-GUPTA and other ASFT officials that if payments were not made to him in the amounts he requested, he would take official steps that would damage ASFT's business, including eliminating the funding it was receiving under existing Navy contracts. Mariano further informed DUTTA-GUPTA and other ASFT officials that if, on the other hand, he were to continue to receive the payments he demanded, he would take official steps to assist ASFT, including adding funding to existing ASFT contracts. DUTTA-GUPTA agreed to a variety of mechanisms over the years to make substantial payments to Mariano in exchange for Mariano's use of his official position to add millions of dollars in funding to ASFT contracts.

8. In or about 1999, DUTTA-GUPTA agreed to make payments to Mariano through the use of various companies that were to serve as subcontractors to ASFT on its Navy contracts. Three of these subcontractors were owned and operated by Russell Spencer ("Spencer"), a Rhode Island resident, or his wife Debra Spencer. The first of these three corporations, ADQ Associates, Inc. ("ADQ"), was incorporated in Rhode Island in July 1999 and remained in business until September 30, 2003, at which time it was dissolved by Spencer. Upon the dissolution of ADQ, Spencer formed C&S Technology, Inc. ("C&S"). C&S was incorporated in Rhode Island in September 2003, and served as a subcontractor on ASFT's Navy contracts beginning in 2003. In addition to ADQ and C&S, Spencer formed a third corporation to serve as a subcontractor to ASFT for technological services provided to the Navy. This corporation, S.I. Technologies, Inc. ("SITI"), was incorporated by Spencer in the State of Rhode Island in

-3-

November 2009. SITI operated under the umbrella of C&S and used the same address as C&S in Portsmouth, Rhode Island.

9. From in or about 1999 through January 2011, Mariano would periodically provide DUTTA-GUPTA and other ASFT employees with a list of subcontractors and the amounts that ASFT was to pay the subcontractors on a weekly or bi-weekly basis. Mariano would also instruct ASFT which Navy contract, or "funding vehicle," to invoice for these payments. At times, Mariano demanded that ASFT make the weekly or bi-weekly payments to the subcontractors before ASFT had received funds from the Navy to cover these payments. Spencer and his wife owned three of the subcontractors (ADQ, C&S and SITI, in chronological order) that received weekly or bi-weekly payments from ASFT in amounts determined by Mariano for work that largely had not been performed. Spencer, on behalf of these subcontractors, submitted inflated invoices to ASFT to justify the payments. Spencer then distributed the funds received from ASFT to Mariano, individuals associated with Mariano (including his father, brother and long-time girlfriend) or entities controlled by Mariano's associates.

10. In addition to having payments be made to Mariano, defendant DUTTA-GUPTA directed that Spencer pay a portion of the monies received from the inflated invoices directly to Strategic International Concepts, LLC ("SIC"), a technical services company, that was owned by DUTTA-GUPTA. DUTTA-GUPTA was unable to fund SIC directly due to federal accounting regulations. He therefore directed Spencer to make substantial payments to SIC, in addition to the payments that were being made to Mariano.

11. The amounts being paid to Mariano, his family members and associates increased over time. By late 2010, Spencer was paying the following approximate weekly amounts from either his personal account, the C&S account, or the SITI account: (i) $4,750 to Mariano, deposited in a joint account held by Spencer and Mariano; (ii) $3,250 to Mariano, deposited in Mariano's personal account; (iii) $7,000 to Mariano's father; (iv) $3,900 to P&C Strategies, Inc. (a company owned by Mary O'Rourke); (v) $3,500 to NDC Consulting, Inc. (a company owned by Joseph Mariano, Ralph Mariano's brother); and (vi) $6,500 to SIC (owned by defendant DUTTA-GUPTA). While the rates above were weekly, most of the payments were made bi-weekly for amounts covering a two week period. In addition, since approximately 2006, Spencer paid $3,500 to MARIANO every other week in the form of cash.

12. In addition to taking millions of dollars from ASFT for himself and his family members, Ralph Mariano used his official position within the Navy to insist on numerous personnel moves within ASFT. Mariano demanded that certain employees of ASFT be fired, directed that friends or associates of his be hired by ASFT and directed what their salaries should be. DUTTA-GUPTA, due to both concern of possible reprisal from Mariano and a desire to continue to have funding added to the ASFT/Navy contracts, submitted to Mariano's demands and hired and fired numerous employees at Mariano's direction.

13. From in or about 1996 through January 2010, at least $8,000,000 was paid by ASFT (largely through its subcontractors) to Mariano, Mariano's family members and associates In addition, at least $1,200,000 paid to subcontractors based on inflated invoices was funneled back to SIC, a corporation owned by defendant DUTTA-GUPTA.

SIC was established by DUTTA-GUPTA as a vehicle through which he could invest in private business projects that were not connected to the Navy.

14.   In exchange for Dutta-Gupta and ASFT's payments of millions of dollars from 1996 through 2011, Mariano took active steps to ensure that ASFT receive payment on invoices submitted and that additional funds were added to existing ASFT contracts when needed. In his position as Program Officer, Mariano regularly instructed Navy contracting officers to add funding to ASFT contracts and delivery orders. In addition, MARIANO completed numerous Funding Certification forms when he added funds to the ASFT contracts. Through these and other mechanisms, Mariano was able to utilize his position as a Program Officer with NAVSEA to add millions of dollars to existing ASFT contracts.